UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2004 JUN 17 P 3: 41

HEIDI K. ERICKSON
   Plaintiff

v.

DAVID SOMERS, NORMA SOMERS
CRAIG SOMERS, DANIEL WUENSCHEL ET. AL.
   Defendants

CIVIL ACTION NO 04-10629 DPW

CORRECTION TO VERIFIED MOTION OR IN THE ALTERNATIVE REQUEST FOR CLARIFICATION ON ORDERS ISSUED ON MAY 5th, 2004 AND ADDITION of MISSING EXHIBIT (Affidavit Michael Johnston)

1. Plaintiff respectfully requests that this Honorable Court take judicial notice of at least two errors in the above captioned pleading. Apparently because of Plaintiff's disability of dyslexia she inadvertently misspelled two words having some importance in this pleading she requests of this Court to Correct.

IN SUPPORT

2. **PARAGRAPH 5**: Plaintiff points to the word "who" in the 5th paragraph to be corrected "how".

3. **PARAGRAPH 6**: referring to the missing word "be" in the sentence *"Ms. Erickson attested to income from unemployment insurance of approximately <$2200.00 over the last 12 months but as of today would <$1200.00."*, should read: *"Ms. Erickson attested to income from unemployment insurance of approximately <$2200.00 over the last 12 months but as of today would be <$1200.00."*.

4. **PARAGRAPH 11**: to correct the word "he" contained in the 11th paragraph should be the word "the". Specifically the sentence *"Courts recognize he obligation as enforceable under 42 USCS section 1983."* Corrected to: *"Courts recognize the obligation as enforceable under 43 USCS section 1983."*

5. Lastly, the words contained in [ ] added to the paragraph entitled "THEREFORE: ...and/or recommend the removal to the 1st Circuit [recommending to be] removable to the jurisdiction of the 4th Circuit." Should be corrected to include those words that were inadvertently left out.

6. Plaintiff states that do to her dyslexia the above misspellings, missing words and letters had not been seen by her at the time she edited this pleading nor could they have been found by software including those other grammatical mistakes not listed herein. Despite her numerous editing attempts, or inability to afford an editor this court requires exactness in pleadings and obviously requires one, therefore Plaintiff requests this court provide her with a reasonable accommodation to correct these mistakes and/or take judicial notice thereof and to provide her with an editor.

Respectfully submitted by: Heidi K. Erickson, *pro se* June 17th, 2004

*I sign herein attesting that the above paragraphs are true under the pains and penalties of perjury. By signature herein I have caused a copy of this Document to be served upon the Defendants and/or their attorneys.*

1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS:                                              SUPERIOR COURT
                                                            NO. 04-1070

HEIDI ERICKSON                    )
                                  )
V.                                )
                                  )
                                  )
MICHAEL JOHNSTON,                 )
DANIEL J. WUENSCHEL, and          )
CAMBRIDGE HOUSING AUTHORITY       )

## AFFIDAVIT OF MICHAEL JOHNSTON

1. My name is Michael Johnston, and I am the Director of Leasing and Occupancy for the Cambridge Housing Authority ("CHA").

2. In part, my position as Director of Leasing and Occupancy requires that I oversee the administration of the Housing Choice Voucher Program, formerly known as the Section 8 Certificate/Voucher Program. As the head of the Leasing and Occupancy Department, staff, landlords and tenants often contact me for information concerning the program.

3. On March 4, 2004, Craig Somers contacted me at my office. He informed me at that time that he met with the plaintiff on February 29, 2004 and acting as an agent for his parents, agreed to rent her an apartment. According to Mr. Somers, the plaintiff never identified herself as a participant of the Housing Choice Voucher Program and actually portrayed herself as an employed paralegal working in Boston. The plaintiff signed a lease, provided a check for the first and last months rent and received the keys. On March 12, 2004, the plaintiff appeared unannounced at the home of Mr. Somers' parents in Stoughton and demanded that they sign a Request for Tenancy Approval. Having never met the plaintiff and being caught by surprise, they informed the plaintiff that they needed to sort things out over the weekend. Mr. Somers called the CHA for advice on how to proceed.

4. During the March 15, 2004 conversation, Mr. Somers expressed concern as to the manner in which the plaintiff demanded that his parents sign the HUD form and even the fact that the plaintiff sought out his parents at their home. Mr. Somers also indicated that his mother had recognized the plaintiff and was concerned about having her for a tenant.

5. During the March 15, 2004 conversation, I informed Craig Somers that it was my belief that the plaintiff's voucher had already expired and that they should have the plaintiff contact me directly. When asked I also stated that they should hold off signing any documents

having to do with the Housing Choice Voucher Program until a determination was made regarding the expiration of the voucher.

6. I have never spoken to David and Norma Somers directly either on the phone or in person.

7. On March 16, 2004 at 4:16 p.m., the plaintiff dropped off a written request for me to reconsider my decision regarding the expiration of her voucher. The CHA was closed on March 17, 2004.

8. On March 18, 2004 at 9:45 a.m., the plaintiff then dropped off a written request for an emergency meeting with the Executive Director, the Legal Department and myself citing my refusal to respond to her prior request for reconsideration. The Executive Director contacted me later that afternoon when he returned from an out of office meeting and asked me to review the material and draft a responses as soon as possible.

9. On Sunday, March 21, 2004, I completed a response to the plaintiff and it was mailed out on March 22, 2004. On March 23, 2004, the plaintiff requested a faxed copy of my response and it was sent out at 11:03 a.m. on the same date.

10. I have never provided any potential landlord with personal information regarding the plaintiff.

11. I have never had any contact with Mr. Oliva, Mr. Mecile, Ms. Morrison or any employee of the Rockport Housing Authority.

12. I have had conversations with Mr. Thomas of New Braintree and Rural Housing Authority. Specifically, Mr. Thomas contacted me on several occasions to inform me of his problems with the plaintiff and his attempts to regain possession of his property.

13. My contact with Rural Housing Authority was based on the New Braintree property and involved the fact that they were unable to find comparables to support the owner's requested rent. They also made it clear that they wanted nothing to do with the plaintiff and refused to administer her voucher even if the owner reduced his rent.

14. The Housing Choice Voucher Program is a tenant-based program whereby an applicant is issued a document (voucher) that identifies him/her as a participant. The participant is then required to perform a housing search in order to locate an apartment on the private market where the owner is ready, willing and able to lease an apartment to the Housing Choice Voucher participant.

15. When issued, the voucher has a lifespan of two months with a provision for a two-month extension. It is the responsibility of the participant to locate and secure an apartment within the lifespan of the voucher. It is expected that not every participant will locate an apartment within the lifespan of the voucher and the voucher will expire.

ID # 387476v01/7204-103/ 03.24.2004

16. During the end of 2002 and the early part of 2003, the success rate of voucher participants was approximately 60% meaning that four out of every ten applicants that were issued vouchers failed to locate an apartment and his/her voucher expired.

17. Since early 2003, the rental market has softened considerably and the success rate is almost 100%. In fact, the CHA maintains a list of apartments where the owner is willing to accept vouchers and this list currently has 110 apartments listed and some have been available since January. These are all willing and able owners ready to participate in the Housing Choice Voucher Program.

18. The plaintiff received and first utilized her voucher in March of 2002. In October of 2002, the plaintiff vacated this apartment and was issued another voucher dated October 1, 2002 with a final expiration date of February 1, 2003. Through various maneuvers the plaintiff was able to lease another apartment with her voucher on April 1, 2003 despite the fact that her voucher had expired February 1, 2003. The plaintiff subsequently vacated this apartment in October of 2003. Plaintiff was issued a new voucher dated September 4, 2003 with an expiration date of January 4, 2004. This is the voucher that is currently at issue.

19. Since receipt of the voucher in September, the plaintiff has not secured an apartment where the voucher has been successfully utilized.

20. On numerous occasions the plaintiff has asked to utilize the "tolling" provision as documented in our Housing Choice Voucher Administrative Plan. The purpose of the tolling provision is to assure that a participant is not penalized by extenuating circumstances that have prevented said participate from performing an adequate housing search.

21. The last request by the plaintiff for a tolling on her voucher was granted in a written correspondence on January 29, 2004, a copy of which is attached as an exhibit to the plaintiff's motion papers. Additionally, the plaintiff and I spoke on the phone regarding this particular tolling request. At that time it was explained to the plaintiff that the period would end once it was clear that she needed to reinitiate her housing search and at that point she would have thirteen days in which to locate another apartment and to submit a Request for Tenancy Approval.

22. It is my belief that the plaintiff knew she needed to initiate another housing search when MCAD dismissed her claim of discrimination against her then current landlord. This claim was dismissed on February 25, 2004 and the voucher should be considered expired as of March 10, 2004.

23. On March 18, 2004 when the plaintiff delivered a written request for an emergency meeting with the Executive Director, she attached what she considered to be an affidavit from Janice Benoit, a Nurse Practitioner. I contacted and spoke to Ms. Benoit by telephone on March 19, 2004. During that conversation she stated that the plaintiff had been searching for another apartment well before the dismissal of the discrimination complaint. She

stated that she drove the plaintiff to view apartments in Cambridge and Rockport and further that the plaintiff often used rental cars to view apartments on her own.

24. In light of information from Ms. Benoit concerning the plaintiff's continued housing search the tolling period on the plaintiff's voucher should have ended long before March 10, 2004. Even the fact that the plaintiff was seeking a new apartment on February 29, 2004 is evidence that she was in fact conducting a housing search.

25. Again, the tolling provision is meant to assure that a participant is not penalized by extenuating circumstances that have prevented said participant from performing an adequate housing search. The statements provided by Ms. Benoit as well as the actions of the plaintiff of actually being out and searching for an apartment on February 29, 2004 clearly indicates that the plaintiff has not been deterred from an adequate housing search.

26. Making a decision to deny the tolling request of a participant or standing by while a voucher expires is not something that the CHA or I take lightly. As an administrator of the Housing Choice Voucher Program, I am completely responsible for the overall operation of the program here in Cambridge. Currently, the CHA Voucher program is allocated 2,487 vouchers and has an annual budget of $24 million. In prior years, the Department of Housing and Urban Development allowed what was termed over leasing which essentially meant that the CHA could be compensated for spikes that often occurred with our leasing numbers. Since October of 2003, HUD has ended this practice with little prior warning. At that moment, the CHA has 2,528 vouchers that are in use where a landlord is being paid a subsidy on behalf of a voucher participant. The 41 over leased vouchers will cost the CHA $409,344 over the next year and this is money that the HUD will not reimburse. Last year, over-leasing cost the CHA $1.6 million. Unfortunately, there is now tremendous pressure to adhere to expiration dates and the rules governing the termination of participation for all participants in order to reduce the number of vouchers under lease.

*Signed under the pains and penalties of perjury this 24th day of March, 2004.*

_____
Michael Johnston

## CERTIFICATE OF SERVICE

I, John Egan, hereby certify that I served a copy of the within Affidavit of Michael Johnston on the plaintiff, *pro se*, in hand on March 24, 2004.

_____
John Egan

4

ID # 387476v01/7204-103/ 03.24.2004